NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 260208-U

NO. 4-26-0208

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 26, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* A.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
| Petitioner-Appellee, | ) | No. 25JA39 |
| v. | ) | |
| Eric M., | ) | Honorable |
| Respondent-Appellant). | ) | John C. Wooleyhan, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Knecht and Harris concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court reversed the trial court's order suspending respondent's visits with his child, A.S., finding the trial court abused its discretion in denying even supervised visits.

¶ 2     In July 2025, the State filed a petition for an adjudication of wardship over A.S. (born July 2020). Soon after, respondent, Eric M., was identified as A.S.'s father. At the first dispositional hearing, the trial court suspended respondent's visitation until he completed certain tasks recommended by his caseworker. Respondent appeals that order, arguing the court abused its discretion in denying him visitation.

¶ 3     We agree. For the reasons that follow, we reverse the trial court's order and remand for further proceedings.

¶ 4                              I. BACKGROUND

¶ 5     In July 2025, the State filed a petition for adjudication of wardship over A.S. and

her baby brother, S.S. The State alleged that the children were abused and/or neglected because A.S. was seen outside and unsupervised for approximately 30 minutes. A.S. reportedly went to a neighbor's house and said she did not want to go home. The petition further alleged that, less than a week later, law enforcement officers observed A.S. in dirty clothes, with "feet *** caked with dirt" and she told them that her mother, Madelyn S., slapped her. Madelyn also allegedly asked that her children be taken away, stating she " 'can't take this anymore' " and other expressions of defeat. Soon after filing its petition, the State filed an amended petition with similar allegations, as well as a motion for temporary custody. At a shelter care hearing, the trial court found probable cause to believe that A.S. was neglected, and it granted the Illinois Department of Children and Family Services (DCFS) temporary custody and guardianship.

¶ 6        In September 2025, the State filed a second amended petition for adjudication of wardship, listing respondent as A.S.'s father. Respondent entered an appearance, and counsel was appointed.

¶ 7        The trial court held an adjudicatory hearing on November 21, 2025. Deputy Magaliy Espinoza from the Adams County Sheriff's Office testified that on July 21, 2025, Madelyn's neighbors contacted police while they were watching A.S. When Deputy Espinoza went to the apartment building, she met with the neighbors for "a few moments" before Madelyn arrived from another apartment. According to Deputy Espinoza, Madelyn told her "the front door had an issue with [A.S.] going out the front door, unlocking it, and she didn't know she was outside playing." Deputy Espinoza reported the matter to DCFS but left A.S. with Madelyn.

¶ 8        According to Deputy Espinoza, on July 27, 2025, DCFS received a report that Madelyn crashed a truck, and DCFS asked Deputy Espinoza to remove the children. She went to Madelyn's residence, where she found Madelyn sitting on the floor in the dark with her hands on

her head. Deputy Espinoza testified that Madelyn "[a]ppeared to be very distraught, disheveled[,] sluggish, [and] appeared to be lethargic." Madelyn told her she was tired and needed a "break from taking care of the children." A.S. told Deputy Espinoza that her mother had slapped her. On cross-examination, Deputy Espinoza admitted that Madelyn claimed she parked the truck, not crashed it.

¶ 9          DCFS investigator David Rowlands testified he received a report on July 27, 2025 that Madelyn's car had broken down and she walked to her father's house with the children in high heat. Rowlands went to her apartment, and he saw Madelyn sitting on the floor in the dark. He called the police and tried to get Madelyn to come to the door. He testified that A.S. was "very dirty," explaining, "Her feet were caked with mud." A.S. told him that they ran out of gas and had to walk in the heat. Madelyn repeatedly told him, "[T]ake me to jail or, I can't do this anymore." He believed Madelyn was "going through some mental health crisis" and could not care for the children.

¶ 10          Madelyn testified that A.S. was not unsupervised on July 21, 2025. She testified that she saw Deputy Espinoza arrive at her residence when she was outside and she told the deputy that A.S. had walked outside and was not listening to her instruction that she go back inside. She testified that on July 27, she ran out of gas on the way to her father's farm and she walked the rest of the way with her two children. She was upset that evening because she had applied for services from DCFS but received no response. She told the DCFS investigator that she needed a break. She denied slapping A.S.

¶ 11          The trial court found insufficient evidence to determine what happened on July 21, 2025, but, based on the evidence from July 27, the State had proved by a preponderance of the evidence that the children were neglected and/or abused. The court set the case for a dispositional

hearing.

¶ 12         A dispositional report prepared by Jessica Fuller, a "Child Welfare Specialist" at Chaddock Attachment & Trauma Services, was filed in January 2026. The report stated that respondent lived in Asley, Illinois, with his girlfriend. According to the Fuller, the home was "appropriate and well furnished with no concerns." Respondent had a room for A.S. with a bed and toys. He had a pending charge for receiving, possessing, or selling a stolen vehicle. He also had a 2020 conviction for domestic battery.

¶ 13         The report stated respondent had not seen A.S. from December 2024 until his first visit on November 6, 2025. Respondent was offered two-hour supervised visits once per week. The report stated, "Initially [A.S.] did not want to attend the visits, as she was not familiar with [respondent.] It is reported [A.S.] has become more comfortable since the initial visit." Respondent attended one visit via Zoom, stating that his girlfriend had COVID-19. He also canceled a visit "due to illness" and rescheduled another. Respondent was referred for parenting classes. The report stated, "It is reported by the program facilitator, Brittany Westlake[,] that [respondent] declined to participate in these classes reporting he did not need them feeling they were unnecessary and conflictual with his work schedule."

¶ 14         The report stated that respondent was "marginally cooperative" with Fuller, adding, "[Respondent] can be extremely argumentative and lacks accountability or responsibility in relation to this child welfare case." During a visit, respondent became "verbally aggressive" and cursed at Fuller. She ended the visit and left "due to safety concerns." The report stated that Fuller would bring additional workers to future visits with respondent.

¶ 15         The report concluded respondent needed a mental health assessment, domestic violence services, and parenting classes. Respondent claimed that he already completed a domestic

violence program, but he was unable to provide documentation.

¶ 16    The trial court held a dispositional hearing on February 10, 2026. At the beginning of the hearing, the State asked the court to grant custody and guardianship to DCFS. The State further asked the court to suspend visitation with Madelyn and to order that visits with respondent be supervised. The guardian *ad litem* (GAL) stated only that he agreed with the State.

¶ 17    Respondent testified that he lived in a house with three bedrooms and two bathrooms. A.S. had her own room, with a bed, television, and dresser. Respondent had partial custody of two of his other three children. He admitted that he had a pending case in Pike County. He testified that he completed a domestic violence assessment in 2021.

¶ 18    The trial court found the minors were neglected, and it placed custody and guardianship with DCFS. The court also found,

> "At this point, we don't have enough information to say one way or the other what the level of fitness or ability is with regard to [respondent]. The report does show or state that he, for a certain period of time of about a year, did not have any contact with his child, [A.S.], for the reasons stated. We don't know yet what the relationship is between [respondent] and [A.S.]. We do know that the report that we have today has stated that [respondent] is not fully engaged in services, has stated on more than one occasion to the caseworker he does not want to be engaged in parenting classes. He has completed some assessments at an earlier date, not a part of these proceedings. And if the caseworker needs more current information, then they're—that's part of their function, is to obtain that current information."

The court concluded, "Visits by [respondent] are also being suspended until he can do those things that the caseworker needs to have done, *i.e.*, complete some parenting classes and provide those

documents or assessments that are being requested."

¶ 19    This appeal followed.

¶ 20                        II. ANALYSIS

¶ 21    Respondent appeals only the trial court's suspension of his visits with A.S. at the dispositional hearing. In proceedings under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2024)), after a trial court determines that a minor is abused or neglected at an adjudicatory hearing, the court holds a dispositional hearing. See *id.* § 2-22. Section 2-22(1) of the Juvenile Court Act states,

> "(1) At the dispositional hearing, the court shall determine whether it is in the best interests of the minor and the public that the minor be made a ward of the court, and, if the minor is to be made a ward of the court, the court shall determine the proper disposition best serving the health, safety and interests of the minor and the public. The court also shall consider [DCFS's] diligent efforts in family finding and relative engagement for the minor required under Section 2-27.3 beginning July 1, 2025, the permanency goal set for the minor, the nature of the service plan for the minor and the services delivered and to be delivered under the plan. All evidence helpful in determining these questions, including oral and written reports, may be admitted and may be relied upon to the extent of its probative value, even though not competent for the purposes of the adjudicatory hearing." *Id.* § 2-22(1).

Section 2-23 adds that "[t]he court also shall enter any other orders necessary to fulfill the service plan, including, but not limited to, (i) orders requiring parties to cooperate with services, (ii) restraining orders controlling the conduct of any party likely to frustrate the achievement of the goal, and (iii) visiting orders." *Id.* § 2-23(3). When reviewing a trial court's determination at a

dispositional hearing, we will reverse "only if the court's findings of fact are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order." *In re Taylor B.*, 359 Ill. App. 3d 647, 650 (2005); see *In re D.S.*, 307 Ill. App. 3d 362, 366 (1999).

¶ 22    At the dispositional hearing here, the trial court granted DCFS custody and guardianship of A.S., and it ordered that respondent's weekly supervised visits with A.S. be suspended until he complied with his caseworker's recommendations. This included parenting classes and providing documentation of his completed domestic violence classes.

¶ 23    Respondent argues that this suspension of his visits was an abuse of discretion. The Juvenile Court Act provides that even after a parent loses legal custody or guardianship of a child, that parent retains "residual parental rights and responsibilities," including "the right to reasonable visitation (which may be limited by the court in the best interests of the minor as provided in subsection (8)(b) of this Section)." 705 ILCS 405/1-3(8), (13) (West 2024). Subsection (8)(b) states that " '[g]uardianship of the person' of a minor" includes "the authority and duty of reasonable visitation, except to the extent that these have been limited in the best interests of the minor by court order." *Id.* § 1-3(8)(b). Respondent contends that in denying him all visitation with A.S., the trial court infringed on his residual right to visitation and abused its discretion.

¶ 24    We agree with respondent. No party asked the trial court to suspend all respondent's visits with A.S. The State asked for supervised visits, and the GAL simply agreed with the State's recommendation. Respondent had been visiting with A.S. for two hours per week before the dispositional hearing. Although one of those visits ended early because respondent became confrontational with his caseworker, the record contains little other information on what took place during this visit. We do not find respondent's shouting sufficient reason to terminate all his visits

with his daughter. Similarly, respondent's reluctance to complete parenting classes and his delay in documenting his prior domestic violence classes do not warrant ending even his supervised visits with A.S. Simply put, we see no reason why respondent's supervised visits with A.S. could not continue, and when the State and the GAL did not ask for suspension of visits, the trial court abused its discretion in ruling otherwise.

¶ 25        Respondent contrasts this case with other cases in which we upheld a dispositional order denying all visitation. In *Taylor B.*, the respondent had previously been imprisoned for punching the child in the face. *Taylor B.*, 359 Ill. App. 3d at 648. He also threatened to kill her. *Id.* Later, the trial court adjudicated the minor neglected. At the time of the first dispositional hearing, the respondent was incarcerated. *Id.* The child had told caseworkers she was afraid of the respondent, she did not want contact with him, and she intended to seek an order of protection against him. *Id.* at 649. The GAL asked the court not to grant any visitation. *Id.* The court ordered that the respondent's visits be suspended. *Id.* The respondent appealed, and we affirmed the court's order. *Id.* at 650, 652. We found that the court placed "reasonable limits on visitation that were in the best interests of the minor." *Id.* at 652.

¶ 26        Similarly, in *D.S.*, the child had been sexually abused by her father for years. *D.S.*, 307 Ill. App. 3d at 363. When the State sought an adjudication of wardship on the child's behalf, it alleged that the child's mother "did nothing to stop the abuse" and that she hit the child in the head. *Id.* At a dispositional hearing, the mother was granted supervised visits. However, the child refused to attend the visits. *Id.* at 364. At a subsequent dispositional hearing, a caseworker testified that the child "suffered emotional trauma after each visit." *Id.* The child testified that her mother "ma[d]e her feel like the abuse was her fault." *Id.* The child believed her mother knew about the abuse and did nothing to intervene. *Id.* As a result, the child did not want visits with her mother.

*Id.* A letter from the child's counselor was introduced into evidence, in which the counselor opined that visits were " 'therapeutically inadvisable.' " *Id.* at 365. The trial court denied the mother visitation. *Id.* She appealed, arguing the court abused its discretion in denying even supervised visits. *Id.* at 366. We affirmed, emphasizing that the court "properly considered the best interests of [the child]." *Id.* at 367.

¶ 27 We agree with respondent that both cases are distinguishable. Although respondent here has a prior conviction for domestic battery, there is no indication in the record that respondent ever abused A.S. This distinguishes both *Taylor B.*, where the father was convicted of battering the child and threatened to kill her (*Taylor B.*, 359 Ill. App. 3d at 648), and *D.S.*, where the mother "slammed her [child's] head into a wall and put her in close proximity to her father, who had sexually abused her" (*D.S.*, 307 Ill. App. 3d at 366). Moreover, in *Taylor B.*, the minor's GAL asked that the court order no visits. *Taylor B.*, 359 Ill. App. 3d at 649. In *D.S.*, the minor herself testified she did not want visits with her mother, and her counselor advised against visits. *D.S.*, 307 Ill. App. 3d at 364-65. Here, no one, not even the State, urged the trial court to suspend all visits between respondent and A.S.

¶ 28 The parties also discuss *In re A.A.*, 315 Ill. App. 3d 950 (2000). There, in its first dispositional order, the trial court ordered the respondent "to establish and maintain regular visitation with the minors, obtain psychological and alcohol/drug evaluations, and successfully complete any course of counseling and treatment recommended as the result of these evaluations." *Id.* at 951. Over one year later, the court ordered the respondent to complete counseling, parenting classes, and a psychological evaluation and to cooperate with other matters related to the case. *Id.* At multiple permanency review hearings over the following year, the court found the respondent "had made little or no progress." *Id.* at 952. After the respondent continued refusing counseling

and failed to cooperate with DCFS, the trial court suspended his visits until he " 'engage[d] regularly in a course of counseling.' " *Id.*

¶ 29    The respondent appealed the suspension of his visitation, but we affirmed the trial court's order. We found that the respondent's

> "failure to get the counseling he has been ordered to obtain while continuing to maintain a close relationship with the minors through his regular visits has contributed to the children's false hopes that their family will be reunited in the near future. Such false hopes are certainly not in the best interests of the children."
>
> *Id.* at 953.

We concluded that the respondent's "attitude of disinterest in obtaining the needed counseling, and his obvious failure to do so," justified the suspension of his visits. *Id.* at 954.

¶ 30    The State contends that this case is comparable to *A.A.* Respondent's dispositional report stated that he needed to complete a mental health assessment, domestic violence services, and a parenting class. The State contends that, as in *A.A.*, " '[t]he loss of visitation rights is essentially "the stick" the court is holding over respondent's head to get compliance with another of its orders: counseling.' " (quoting *A.A.*, 315 Ill. App. 3d at 953). According to the State, the trial court reasonably suspended visitation to incentivize respondent to complete the required services and cooperate in the child welfare process.

¶ 31    We disagree. We do not dispute the general notion that a trial court can, in appropriate circumstances, suspend visits with a child to motivate a particularly uncooperative respondent to complete required services or otherwise take necessary steps to advance the case toward reunification or some other end point. However, those circumstances are not present here. In *A.A.*, the respondent had failed to comply with the court's order for over one year. *Id.* at 952.

Here, the court suspended respondent's visits at the first dispositional hearing. Respondent had not demonstrated the same persistent noncompliance and unwillingness to advance the case as the respondent in *A.A.* Indeed, here, the court had not even formally ordered respondent to engage in any services when it suspended his visits.

¶ 32    Importantly, *A.A.* emphasized that the respondent's continuing failure to comply with the trial court's order was detrimental to the children's best interests, because it gave the children "false hopes." *Id.* at 953. Indeed, the child's best interests were also the paramount consideration in *Taylor B.* and *D.S.* See *Taylor B.*, 359 Ill. App. 3d at 651; see also *D.S.*, 307 Ill. App. 3d at 367. Here, the court apparently suspended respondent's visits with A.S. solely to compel him to cooperate, without discussing the costs of suspending visits to A.S.'s interests. The most important factor that could override respondent's residual right to reasonable visitation was A.S.'s best interests. See 705 ILCS 405/1-3 (West 2024). In suspending all respondent's visits without adequate justification, and especially without reference to A.S.'s best interests, the trial court abused its discretion.

¶ 33                               III. CONCLUSION

¶ 34    For the reasons stated, we reverse the trial court's judgment, and we remand with instructions that the court hold an evidentiary hearing to determine an appropriate visitation schedule.

¶ 35    Reversed and remanded.